# IN THE DISTRICT COURT OF GUAM
# TERRITORY OF GUAM
# BANKRUPTCY DIVISION

| | |
|---|---|
| In re<br><br>MARIANAS PROPERTIES, LLC,[1]<br><br>    Debtor. | Case No. 24-00013<br><br>Chapter 11<br><br>**DECLARATION OF AJAY POTHEN IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS** |

I, Ajay Pothen, declare, pursuant to section 1746 of title 28 of the United States Code, that:

1.    I am the president of Marianas Properties, LLC, which does business as the Pacific Star Hotel (the "<u>Debtor</u>"). I have been employed by the Debtor since August 2010 and have served as president of the Debtor since 2019. I attended Drexel University's LeBow College of Business and earned a Bachelor of Science in Business Administration in Finance and a Bachelor of Science in Business Administration in Accounting. From August 2007 through and including July 2010, I was employed as a financial analyst for the international consulting firm Booz Allen Hamilton.

2.    All facts set forth in this declaration are based on my personal knowledge or, where specified, based on my knowledge, information, or belief. If I were called to testify, then I would testify competently as to the facts set forth in this Declaration.

3.    In my capacity as president of the Debtor, I am familiar with the Debtor's day-to-day business operations, business, and financial affairs.

4.    I am authorized by the Debtor to submit this declaration in support of its chapter 11 petition and motions requesting relief to assist with the Debtor's transition into chapter 11 (the "<u>First Day Motions</u>").

---

[1]    The last four digits of the taxpayer identification number of Marianas Properties, LLC, are 9263. The principal office of Marianas Properties, LLC, is located at 627b Pale San Vitores Road, Tumon, Guam 96913.

**I.    The Debtor's Organizational Structure**

5.     The Debtor was formed in 2009 as a limited liability company organized under the laws of the Territory of Guam and is headquartered in Guam. Mathews Pothen is the sole member of the Debtor.

6.     The Debtor adopted a resolution (the "Resolution") authorizing the filing of its bankruptcy petition. A true and exact copy of the Resolution is attached as **Exhibit A**. Pursuant to the Resolution, I am authorized to act for and on the behalf of the Debtor in this chapter 11 case.

**II.    Description of the Debtor's Business Operations**

7.     The Debtor owns and has historically operated the Pacific Star Resort & Spa, a hotel and resort located at 627b Pale San Vitores Road, Tumon, Guam 96913 (the "Hotel"). The Hotel is independent and not affiliated with any hotel franchise.

8.     The Hotel has 19 floors with 436 guest rooms and historically offered amenities typical and customary for a resort and spa. These included multiple bars, restaurants and dining, fitness facilities, laundry services, meeting and conference facilities, banquet and wedding services, spa facilities and beauty services, and a swimming pool.

9.     The real estate on which the Hotel is located is comprised of 3 lots of land. The Debtor owns 2 lots (the "Owned Lots") and leases 1 lot (the "Leased Lots"). The landlords of the Leased Lots are: the Estate of Soledad Lujan, Bernice Guerrero Cepeda, Mary Jane T. Guerrero, Joseph Anderson Guerrero, Marie A. Guerrero Salas, Raymond F.A. Camacho, Matilda Cruz, and Teresita Norris.

10.     In 2019, the Debtor's financial performance was better than any prior year. Gross revenue exceeded $17 million, the Debtor's occupancy rate was 77%, and the Debtor's business was profitable and provided adequate revenue to pay ordinary operating expenses. In 2020, the

Debtor was on track to exceed revenues from 2019 when the COVID-19 pandemic ("COVID") severely impacted Guam's local tourism industry, including the Debtor's business.

11. Due to COVID, the Debtor paused hotel operations and no longer accepted hotel guests. Subsequently, the Debtor operated the Hotel as a COVID-related quarantine facility in cooperation with the government of Guam for a short period of time and then suspended guest services operations thereafter.

12. The Debtor planned to reopen the Hotel in 2023. Unfortunately, in May of 2023, Typhoon Mawar caused substantial damage to the Hotel, which prevented its reopening at that time. The Debtor is insured under a policy of insurance with DB Insurance Co., Ltd. ("DB") to provide coverage for such losses at the Hotel. The Debtor has timely submitted a claim to DB but has not yet received full payment, which has prevented the Debtor from making needed repairs that would permit the Debtor to offer hotel services again.

13. More specifically, in the spring of 2024, DB's adjuster identified in excess of $13 million in damage and set the actual cash value of the claim at $12.6 million. Subsequently, in late August of 2024, I learned that further diligence by DB resulted in an increase in replacement cost value of the claim to $16.7 million but that DB proposed an actual cash value of the claim of $7.6 million. The Debtor has engaged its own independent adjuster who indicated that the claim exceeds the $25 million sub-limit under the policy for typhoons—and there could be additional coverage under the insurance policy.

14. Thus far, the Debtor has received an initial payment of $1 million from DB, which was used to maintain the facility and perform certain repairs. The Debtor currently holds a second check for $2 million, which has not yet been cashed. However, I do not know when claim adjustment will be resolved, and delays in final adjustment and payment of the claim have harmed

the Debtor's business and ability to pay creditors when and as required.

15. The Debtor reserves all of its rights, including to seek assistance from this Court to require liquidation of the insurance claim and turnover of its proceeds to the Debtor's estate.

16. Prior to the onset of COVID, the Debtor regularly employed approximately 160 full-time and 80 part-time employees. Due to impacts of COVID and, subsequently, Typhoon Mawar, the Hotel has reduced its work force and currently employs 17 full-time employees and 0 part-time employees. These employees are necessary to maintain and secure the Hotel in its present state of operations.

### III. Parties Who May Claim an Interest in the Debtor's Assets

17. The Debtor has conducted a search of its records and the records of the Guam Department of Revenue & Taxation ("RevTax"). The Debtor is not aware that any party has filed a financing statement perfecting a security interest in accounts receivable or other forms of property that may constitute "cash collateral" within the meaning of the Bankruptcy Code and as to which the filing of a finance statement is sufficient to perfect such security interest.

18. The Debtor has conducted a search of its records to identify parties who may claim a mortgage interest in the Debtor's real property. The Debtor's search of records at Guam's Department of Land Management is underway. Based on information known to date, the following parties may claim an interest in the Debtor's interest in the Owned Lots and Leased Lots:

### A. Bank of Guam

19. Bank of Guam (the "Bank") claims a mortgage interest in the Owned Lots and in the Debtor's interest in the Leased Lots to secure obligations of the Debtor arising out of a loan transaction from 2016 (the "2016 Loan Transaction").

20. More specifically, in 2016, the Debtor and two companies with a common owner, Mathews Pothen, executed and delivered an undated promissory note in the original principal amount of $32 million (the "Promissory Note"). The other two companies are Marianas Gas Corporation (doing business as "Island Equipment") and Guam Industrial Services, Inc. (doing business as "Guam Shipyard") (the Debtor, Island Equipment, and Guam Shipyard shall be referred to as the "Companies"). The 2016 Loan Transaction effectuated a refinancing of a prior loan with First Hawaiian Bank on behalf of one or more of the Companies in addition to providing additional liquidity.

21. In connection with the 2016 Loan Transaction, on or about March 31, 2016, the Debtor and Island Equipment executed and delivered that certain Fee Simple and Leasehold Mortgage on Real Property with Power of Sale and Security Agreement dated March 31, 2016, recorded with the Department of Land Management, Government of Guam, under Instrument No. 890664 (the "Mortgage"). Guam Shipyard also pledged additional collateral in which the Debtor has no interest, and the Companies may have executed and delivered other documents related to the 2016 Loan Transaction. Finally, the Debtor's owner (Mathews Pothen) guaranteed obligations of the Companies arising out of the 2016 Loan Transaction to the Bank.

22. Following alleged defaults under the Promissory Note and the Mortgage in the spring of 2021, the Bank commenced a non-judicial power of sale foreclosure with respect to the Mortgage. The Companies disputed that there were valid defaults under, among other things, the Promissory Note and the Mortgage. Consequently, the Companies commenced an action in the Superior Court of Guam captioned as *Guam Industrial Services, Inc. et al. v. Bank of Guam*, CV-0309-21, in which the Superior Court of Guam issued a temporary restraining order preventing the Bank from completing a foreclosure action. This resulted in the Companies and the Bank entering

into a settlement and amendment to the Promissory Note and other related loan documents from the 2016 Loan Transaction (collectively, the "Loan Documents"). Under this settlement and amendments, the maturity date with respect to the Promissory Note was amended to be June 1, 2024 (the "Maturity Date").

### B. Guam Department of Revenue & Taxation

23. Upon information and belief, RevTax has recorded a lien against the Debtor's assets allegedly securing in excess of $3 million for one or more types of taxes (the "RevTax Lien").

24. Upon information and belief, the RevTax Lien is junior in priority to the Bank's Mortgage, to the extent the Bank's Mortgage is valid and enforceable.

25. The Debtor has not completed its investigation as to the validity and enforceability of the Loan Documents and any liens claimed by the Bank or RevTax. The Debtor reserves all of its rights, including to take the position that the Bank does not have valid, perfected, and enforceable security interests in any of the Debtor's property.

## IV. Events Leading to the Debtor's Chapter 11 Filing and Chapter 11 Exit Strategy

26. In April of 2024, the Debtor's payment to the Bank was a few days late. While the Companies offered to make the monthly payment by the end of April, the Bank declared a default and accelerated the then-outstanding debt. The Debtor has not had sufficient liquidity to satisfy such obligations, which contributed to the filing of this case, as discussed below.

27. On or about August 13, 2024, the Bank issued a certain notice of sale (the "Foreclosure Notice") with respect to the Debtor's assets securing the Mortgage (but not assets of non-debtors Island Equipment or Guam Shipyard), thereby scheduling an auction of the Owned Lots and any interest of the Debtor in the Leased Lots for September 12, 2024, at 10 a.m. prevailing Chamorro Standard Time. The Bank asserts that the outstanding balance of principal and interest

owed was $29.5 million as of August 13, 2024.

28.     The Debtor believes that the value of the Hotel, even in its current state following Typhoon Mawar, exceeds the amounts allegedly owed to the Bank by some or all of the Companies. This belief is based upon appraisals from 2020 valuing the Hotel as set forth in the chart below, in addition to preliminary information pursuant to an appraisal that the Debtor had requested (but was not completed) prior to the Petition Date.

| Valuation Premise | Interest Appraised | Effective Date of Value | FINAL Value Conclusion |
|---|---|---|---|
| Market Value As-Is | Fee Simple & Leasehold Estate | June 6, 2020 | $43,000,000 |
| Prospective Market Value As-Completed and As-Stabilized | Fee Simple & Leasehold Estate | June 6, 2023 | $97,360,000 |
| Insurable Value | Fee Simple Estate | June 6, 2020 | $115,500,000 |

29.     The value set forth above for "Prospective Market Value As-Completed and As-Stabilized" anticipated an infusion of $36 million in improvements to make the Hotel a five star establishment. The value of $43 million did not and was based on the Hotel's pre-Typhoon Mawar condition. Upon information and belief, the present value of the Hotel exceeds $29.5 million, and there may be other assets of the non-debtor Companies providing additional value securing the Mortgage.

30.     As a result, the Debtor has offered the Bank a deed in lieu of foreclosure so that the Hotel could be marketed properly in a manner to maximize value rather than upon approximately 30 days' notice. This proposal was not acceptable to the Bank.

31.     Consequently, the Debtor has commenced this case in order to maximize value of the Hotel and to avoid a value-destructive sale of the Hotel, which is a special asset that may require more marketing than would occur during a 30-day foreclosure auction process. Subject to

events that may unfold in this case and that the Debtor may not foresee, the Debtor preliminarily intends to propose a chapter 11 plan that will satisfy any secured claim of the Bank by transferring title to the Hotel to the Bank and may also propose a sale process on terms acceptable to the Debtor, should the Bank choose. Whether conducted by the Debtor or the Bank, this would permit a sale of the Hotel with adequate and proper marketing free of any other interests or redemption rights.

## V.     Allegations in Support of the First Day Motions

32.     The Debtor has filed several customary motions seeking relief to assist the Debtor's transition into chapter 11 (the "First Day Motions"). In support of the First Day Motions, the Debtor alleges as follows:

### A.     The DIP Motion

33.     The Debtor has or will file that the *Debtor's Motion for Entry of an Order on an Interim and Then Final Basis: (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and a Superpriority Claim; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) for Related Relief* (the "DIP Motion"). The DIP Motion requests entry of an order, first on an interim basis, authorizing the Debtor to borrow funds from Mathews Pothen (the "Lender") under a line of credit note with a maximum principal balance of $1.5 million, pursuant to loan documents filed with the DIP Motion (the "DIP Loan Documents). The DIP Motion would grant the Lender (A) a subordinated lien, junior to any and all other liens or interest of record as of the Petition Date, in all assets of the Debtor's estate; (B) a first priority lien in any Avoidance Actions (as defined in the DIP Motion); and (C) a superpriority adequate protection claim in the event collateral value is insufficient (the "Adequate Protection Claim"). The Adequate Protection Claim is proposed to be junior in payment to a carve out for professional fees and fees for the United States Trustee in order to ensure funding for administrative expenses.

34. Prior to the Petition Date, the Debtor considered a range of options to address its ongoing challenges related to maintaining sufficient cash flow necessary to satisfy operational obligations and to ensure sufficient liquidity to protect and preserve value for creditors. Specifically, prior to negotiating with the Lender, the Debtor, acting through its professionals, inquired with a party that regularly provides postpetition financing to chapter 11 debtors in the middle market regarding potential borrowing terms. However, this lender declined to offer a loan to the Debtor because the amount of capital needed by the Debtor is less than this party typically lends. The Debtor further understands that there is no regular market for debtor-in-possession financing in Guam and that no traditional lenders in Guam would be willing to offer financing to the Debtor in the circumstances in which the Debtor requires it.

35. Ultimately, the Debtor and the Lender negotiated the DIP Facility to provide necessary liquidity on terms that the Debtor believes are fair, reasonable, and in the best interests of the Debtor, its estate, and creditors.

36. Pending a final hearing on the DIP Motion, the Debtor requires authority to borrow amounts set forth in the Budget for the first four weeks, up to $350,000.00 to avoid immediate and irreparable harm to the Debtor, its creditors, and the estate. Such funds are necessary to ensure that the Debtor can adequately fund the administrative costs of this bankruptcy case and, without which, the Debtor would be unable to protect value for creditors. As set forth above, the Debtor believes that the value of the Hotel exceeds any claim that the Bank may hold and that the Bank's proposed auction would destroy value and leave a deficiency that would require distribution of insurance claim proceeds to the Bank rather than repayment of other creditors.

B. **The Payroll Motion**

37. The Debtor has or will file the *Debtor's Motion for Entry of an Order Authorizing*

*Payment of Certain Pre-Petition (I) Wages, Salaries, and Other Compensation; (II) Reimbursable Employee Expenses; (III) Employee Benefits; and (IV) Related Costs* (the "Payroll Motion").

38. By the Payroll Motion, the Debtor seeks an order permitting, but not requiring, the Debtor to pay pre-petition payroll and to maintain employee benefit programs (the "Payroll Motion").  To the best of my knowledge, information, and belief, the allegations in the following paragraphs of the Payroll Motion are true and accurate: 5 through 20.  The Payroll Motion only seeks permission to pay outstanding employee wage obligations that are below $15,150.00 per employee, in addition to authority to maintain existing employee benefit plans and pay employee withholding obligations as required under applicable non-bankruptcy law.

39. I believe that any delay in paying compensation and contributions to employee benefit programs will damage the Debtor's relations with its employees; cause irreparable harm to morale; and harm the value of the Debtor's business, property, and assets.  The Debtor relies on its workforce to secure and protect the Hotel and must continue to do so during this chapter 11 case.  Absent the relief requested in the Payroll Motion, I believe that the Debtor's workforce will suffer undue hardship and, in many instances, suffer financial difficulties because their wages are needed to enable payment of personal obligations.

40. Further, I believe that some members of the Debtor's workforce would seek other employment if not paid and that the Debtor could lose critical team members who would be difficult to replace.

C. **The Cash Management Motion**

41. The Debtor has or will file the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Using its Cash Management System, and (B) Maintain Existing Bank Accounts and Business forms and Books and Records, and (II) Granting*

*Related Relief* (the "Cash Management Motion"). By the Cash Management Motion, the Debtor requests permission to maintain its pre-petition cash management system and bank account in addition to requesting certain other related forms of relief, including authorizing payment through credit or debit cards and wire transfer as well as a waiver of the requirements of section 345(b) of the Bankruptcy Code. The Debtor intends to close certain bank accounts and transition all other bank accounts to approved debtor-in-possession accounts but requires a short period of time in which to do so and does not believe, in the exercise of its business judgment, that it is prudent to be without bank accounts for any period of time.

42. To the best of my knowledge, information, and belief, the allegations in the following paragraphs of the Cash Management Motion are true and accurate: 3 through 15, as well as 20 (excluding first sentence) and 21.

43. I believe the relief requested in the Cash Management Motion is critical to avoid disruption to the Debtor's operations and irreparable harm to the Debtor. The Debtor requires regular and immediate access to funds in its deposit account to purchase supplies, pay payroll, and fund ordinary business expenses. Any gap in the Debtor's ability to engage in ordinary banking functions could interrupt vital business functions, such as payment of payroll, and harm the Debtor.

44. I also believe that the other forms of relief requested in the Cash Management Motion are important to the Debtor's business.

        D.        **The Need for Emergency or Expedited Hearings**

45. Due to the nature of the relief sought by the First Day Motions, the Debtor seeks expedited or emergency hearings as soon as is reasonably possible after the Petition Date.

46. **Payroll Motion:** The Debtor seeks immediate relief with respect to the Payroll Motion. The Debtor's next payroll is due to be paid to employees on Friday September 13, 2024.

Without immediate authority to pay outstanding pre-petition payroll (subject to the limitations of the Bankruptcy Code), the Debtor will not be able to pay its employees in an ordinary and timely manner. This could almost certainly lead to a loss of employees at a time when the Debtor needs them most. This, in turn, could leave the Debtor unable to function, causing irreparable harm.

47. **The DIP Motion:** The Debtor seeks immediate relief with respect to the DIP Motion to ensure adequate liquidity to fund administrative expenses between the Petition Date and the date of a final hearing with respect to the DIP Motion. Without such funding, the Debtor would be unable to maintain its status as a debtor in this chapter 11 case, which could lead to foreclosure by the Bank and destruction of otherwise available value to creditors.

48. **The Cash Management Motion:** The Debtor also seeks immediate relief with respect to the Cash Management Motion. The Debtor must transition into chapter 11 with as little disruption as possible. The Debtor will endeavor to open approved debtor-in-possession accounts promptly but requires a short period of time for such a transition. As a result, the Debtor requests that the Cash Management Motion be granted on an interim basis pending a final hearing.

*[Signature on following page]*

I certify under penalty of perjury that the foregoing is true and correct.

Date: September 11, 2024

_____
Ajay Pothen
President of the Debtor