**MINAKSHI V. HEMLANI**
**LAW OFFICES OF MINAKSHI V. HEMLANI, P.C.**
285 FARENHOLT AVE., SUITE C-312
TAMUNING, GUAM 96913
TELEPHONE: (671) 588-2030
EMAIL: mvhemlani@mvhlaw.net

**ANDREW C. HELMAN** (admitted *pro hac vice*)
**DENTONS BINGHAM GREENEBAUM LLP**
ONE CITY CENTER, SUITE 11100
PORTLAND, ME 04101
TELEPHONE: (207) 619-0919
EMAIL: andrew.helman@dentons.com

*Counsel for the Debtor*

## THE DISTRICT COURT OF GUAM

| | |
|---|---|
| In re | Case No. 24-00013 |
| MARIANAS PROPERTIES, LLC,[1] | Chapter 11 |
| Debtor. | **MOTION FOR AUTHORITY TO SELL CERTAIN ASSETS OF MARIANAS PROPERTIES, LLC, TO ASSUME AND ASSIGN CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS, AND TO ASSIGN PERMITS AND LICENSES IN RELATION THERETO** |
| | **THIS MOTION MAY AFFECT THE PROPERTY RIGHTS OF: (I) BANK OF GUAM, (II) TREASURER OF GUAM, (III) THE U.S. SMALL BUSINESS ADMINISTRATION, (IV) BERNICE GUERRERO CEPEDA, (V) THE ESTATE OF MARY JANE T. GUERRERO, (VI) THE ESTATE OF SOLEDAD LUJAN, (VII) FUJI REAL ESTATE CO., (VIII) JOSEPH ANDERSON GUERRERO, (IX) MARIE GUERRERO SALAS, (X) RAYMOND F.A. CAMACHO, (XI) TERESITA NORRIS, (XII) ESTATE OF DANIEL ANDERSON GUERRERO, AND (XIII) MARIOTT HOTELS INTERNATIONAL B.V. MANAGEMENT COMPANY** |

---

[1] The last four digits of the taxpayer identification number of Marianas Properties, LLC, are 9263. The principal office of Marianas Properties, LLC, is located at 627B Pale San Vitores Road, Tumon, Guam 96913.

24507831.v9

Marianas Properties, LLC, the debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor"), files this motion (the "Sale Motion") requesting entry of an order authorizing the Debtor (i) to sell certain assets of the Debtor to Eastern Contractors Corporation (the "Buyer"); (ii) to assume and assign certain unexpired leases of nonresidential property or any executory contracts in connection with the proposed sale; and (iii) to assign any permits and licenses to the Buyer (collectively, each of (i), (ii), and (iii) being the "Sale Transaction"), pursuant to sections 105, 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), as supplemented by Rules 2002, 6004, 6006, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 6004-1 and 9013-1 of this Court's local rules (the "Local Rules").

The general terms of the Sale Transaction are set forth in that certain Asset Purchase Agreement (as amended from time to time, the "APA"), a copy of which is attached as **Exhibit A**. The transfer of substantially all of the Debtor's assets arising out of the proposed Sale Transaction shall be free and clear of all liens, claims, encumbrances, and interests with all such liens, claims, encumbrances, and interests attaching to the proceeds of the Sale Transaction, except as otherwise provided herein. In support of this relief, the Debtor respectfully requests the Court enter an order:

1.     Approving the Sale Transaction of that certain real estate and improvements (the "Real Property"), certain personal property (the "Personal Property"), and various licenses and permits (the "Licenses and Permits") relating to operation of the Pacific Star Resort & Spa located at 627b Pale San Vitores Road, Tamuning, Guam 96913 (the "Hotel"), all of which are further described in the APA (the legal description of which is included as an exhibit to the APA) free and clear of all liens, claims, encumbrances, and interests; and

2.     Finding that the proposed Sale Transaction is conducted in good faith and that the

proposed Buyer is a good faith purchaser.

The Debtor is entitled to the relief requested in this Sale Motion for the reasons set forth in the accompanying memorandum of law. The Debtor has determined, in its business judgment, that substantially all of the Debtor's assets, including any leasehold interest in certain real property, should be sold to the Buyer under the terms of the APA, free and clear of all liens, claims, encumbrances, and interests. Pursuant to Local Rule 6004-1(b)(1), this Sale Motion is supported by the attached *Memorandum of Law in Support of Motion for Authority to Sell Certain Assets of Marianas Properties, LLC, to Assume and Assign Certain Unexpired Leases and Executory Contracts, and to Assign Permits and Licenses in Relation Thereto*.

Dated: February 17, 2025

Respectfully submitted,

**LAW OFFICES OF MINAKSHI V. HEMLANI, P.C.**

*/s/ Minakshi V. Hemlani*
**MINAKSHI V. HEMLANI**

**DENTONS BINGHAM GREENEBAUM LLP**

*/s/ Andrew C. Helman*
**ANDREW C. HELMAN**

*Counsel for the Debtor*

3

**MINAKSHI V. HEMLANI**
**LAW OFFICES OF MINAKSHI V. HEMLANI, P.C.**
285 FARENHOLT AVE., SUITE C-312
TAMUNING, GUAM 96913
TELEPHONE: (671) 588-2030
EMAIL: mvhemlani@mvhlaw.net

**ANDREW C. HELMAN** (admitted *pro hac vice*)
**DENTONS BINGHAM GREENEBAUM LLP**
ONE CITY CENTER, SUITE 11100
PORTLAND, ME 04101
TELEPHONE: (207) 619-0919
EMAIL: andrew.helman@dentons.com

*Counsel for the Debtor*

## IN THE DISTRICT COURT OF GUAM
## TERRITORY OF GUAM
## BANKRUPTCY DIVISION

| | |
|---|---|
| In re | Case No. 24-00013 |
| MARIANAS PROPERTIES, LLC,[1] | Chapter 11 |
| Debtor. | **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AUTHORITY TO SELL CERTAIN ASSETS OF MARIANAS PROPERTIES, LLC, TO ASSUME AND ASSIGN CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS, AND TO ASSIGN PERMITS AND LICENSES IN RELATION THERETO** |

Marianas Properties, LLC, the debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor")[2], submits this memorandum of law in support of its Sale Motion and respectfully states as follows:

---

[1]     The last four digits of the taxpayer identification number of Marians Properties, LLC, are 9263. The principal office of Marianas Properties, LLC, is located at 627B Pale San Vitores Road, Tumon, Guam 96913.

[2]     Capitalized terms not defined herein shall have the same meanings ascribed to them as in the Sale Motion.

24507831.v9

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue for the above-captioned case is proper in this district under 28 U.S.C. §§ 1408 and 1409.

2.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court has constitutional authority to enter final judgment in this proceeding.

3.     The statutory bases for the relief requested in the Sale Motion are sections 105(a), 363, and 365 of title 11 of the Bankruptcy Code, as well as Bankruptcy Rules 2002, 6004, 6006, 9013 and 9014, and Local Rules 6004-1 and 9013-1.

## BACKGROUND

### I.     General Background.

4.     On September 12, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States District Court, Bankruptcy Division, for the Territory of Guam, thereby commencing this chapter 11 case (the "Case").  No committee has been appointed, and the Debtor is continuing to operate its business and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     The Debtor incorporates herein by reference the *Declaration of Ajay Pothen in Support of Chapter 11 Petition and First Day Motions* [Dkt No. 6] (the "First Day Declaration") concerning its general background and business.  In short, the Debtor owns and historically operated the Hotel, which is located in Tumon, Guam.  The real estate on which the Hotel is located is comprised of three lots of land.  The Debtor owns two of those lots (the "Owned Lots") and leases the remaining lot (the "Leased Lot").  A further description of the Debtor, its business, and the facts and circumstances leading to the commencement of this case and otherwise supporting the Sale

2

Motion are set forth in greater detail in the First Day Declaration.

6. On January 30, 2025, the Court entered the *Order Granting Debtor's Motion for Entry of an Order Pursuant to Section 365(b)(4) of the Bankruptcy Code Extending the Time to Assume or Reject Unexpired Leases of Nonresidential Real Property* [Dkt. No. 144] enlarging the Debtor's deadline to assume unexpired leases and/or executory contracts to and including April 10, 2025.

7. Based upon various circumstances, the Debtor has determined that a sale of substantially all of its assets, including its leasehold interest in the Leased Lots, is likely to maximize the return to the Debtor's creditors and streamline further proceedings in this Case (*i.e.*, simplifying issues that may require resolution in a chapter 11 plan).

## II.     **The Debtor's Pre-Petition Secured Indebtedness.**

8. Prior to the Petition Date, the Bank of Guam (the "Bank") claimed a mortgage interest in the Debtor's Owned Lots and in the Debtor's interest in the Leased Lot to secure alleged obligations of the Debtor arising out of a loan transaction from 2016 (the "2016 Loan Transaction").

9. In 2016, the Debtor and two other companies with a common owner, Mathews Pothen ("Mr. Pothen"), executed and delivered an undated promissory note in the original principal amount of $32 million (the "Promissory Note"). The other two companies are Marianas Gas Corporation (doing business as "Island Equipment") and Guam Industrial Services, Inc. (doing business as "Guam Shipyard," and along with the Debtor and Island Equipment, the "Companies"). The 2016 Loan Transaction effectuated a refinancing of a prior loan with First Hawaiian Bank ("FHB").

10. In connection with the 2016 Loan Transaction, on or about March 31, 2016, the Debtor and Island Equipment executed and delivered to the Bank that certain *Fee Simple and*

*Leasehold Mortgage on Real Property with Power of Sale and Security Agreement dated March 31,* *2016*, recorded with the Department of Land Management, Government of Guam, under Instrument No. 890664 (the "Mortgage"). Guam Shipyard also pledged additional collateral in which the Debtor has no interest, and the Companies may have executed and delivered other documents related to the 2016 Loan Transaction. Mr. Pothen, as the Debtor's owner, guarantied obligations of the Companies arising out of the 2016 Loan Transaction to the Bank.

11.     Following alleged defaults under the Promissory Note and the Mortgage in 2021, the Bank commenced a non-judicial power of sale foreclosure with respect to the Mortgage. Consequently, the Companies disputed that there were valid defaults and commenced an action in the Superior Court of Guam captioned as *Guam Industrial Services, Inc. et al. v. Bank of Guam*, CV-0309-21, in which the Superior Court of Guam issued a temporary restraining order preventing the Bank from completing the foreclosure action. This resulted in the Companies and the Bank entering into a settlement and amendment to the Promissory Note and other related loan documents from the 2016 Loan Transaction (collectively, the "Loan Documents"). Under this settlement and amendments, the maturity date with respect to the Promissory Note was amended to June 1, 2024.

12.     In April 2024, the Bank declared a default and accelerated the then-outstanding debt owed by the Debtor. On August 13, 2024, the Bank issued a certain notice of sale (the "Foreclosure Notice") with respect to the Debtor's assets securing the Mortgage and scheduled an auction for September 12, 2024, of the Owned Lots and any of the Debtor's interest in the Leased Lot. As of August 13, 2024, the Bank's outstanding balance of principal and interest owed by the Debtor was $29.5 million. However, such auction was not held due to the Debtor commencing the Case.

13.     In addition to the prepetition indebtedness owed to the Bank, upon information and belief, the Treasurer of Guam has recorded a lien against the Debtor's assets for one or more types

of taxes.  Upon information and belief, this includes a lien senior to the Bank to secure real property

taxes in the amount of approximately $230,000.00 as well as liens junior to the Bank, to the extent

the Bank's Mortgage is valid and enforceable.  Additional parties who may claim an interest in the

Hotel or the Debtor's assets are identified in a title report with respect to the Owned Lots attached

as **Exhibit B** (the "Owned Lots Title Report"),[3] a title report with respect to the Leased Lots

(provided with respect to any interest claimed in the leasehold estate of the Debtor) attached as

**Exhibit C**, and financing statements attached as **Exhibit D**.  All such parties have or will be

provided notice of this Motion.

14.     The following chart lists alleged lienholders that may be affected by the Debtor's

request to sell free and clear pursuant to this Motion:

| Mortgagee/Holder | Title Report Encumbrance No. | Instrument No. |
|---|---|---|
| Parcel Nos. I, II, &III – Lot Nos. 5140-1-2, 5140-2-R2, & 5140-2-2 | | |
| Guam Department of Revenue and Taxation ("DRT") c/o Jennifer Cruz-Matsumiya Dept. of Revenue & Taxation Taxpayer Services Division P.O. Box 23607 Barrigada, Guam 96921 | 10, 11, 20, 21, 23, 24, 25, 26 | Real Estate Taxes Due and Owing |
| Bank of Guam c/o Arriola Law Firm LLC 259 W. Martyr Street, Ste. 201 Hagatna, Guam 96910 | 14 | 890664, 997435, 997436, 1001025 |
| DRT c/o Jennifer Cruz-Matsumiya Dept. of Revenue & Taxation Taxpayer Services Division P.O. Box 23607 Barrigada, Guam 96921 | 15 | 948827 |
| DRT c/o Jennifer Cruz-Matsumiya Dept. of Revenue & Taxation Taxpayer Services Division P.O. Box 23607 Barrigada, Guam 96921 | 16 | 958989 |

---

[3]     All exhibits are identified sequentially, beginning with those attached to the accompanying Motion.

| DRT c/o Jennifer Cruz-Matsumiya Dept. of Revenue & Taxation Taxpayer Services Division P.O. Box 23607 Barrigada, Guam 96921 | 17 | 958990 |
|---|---|---|
| U.S. Small Business Administration ("SBA") 312 North Spring Street, Floor 5 Los Angeles, CA 90012 | N/A – identified in the attached financing statements claiming a security interest in personal property | UCC File No. 33436 |

15.    In addition, the Debtor notes as follows with respect to two parties who do not hold any interest in the Owned Lots but are identified in the title report as to the Owned Lots.

-    The Owned Lots Title Report, in exception 28, refers to a certain Partial Assignment of Rents dated January 1, 1982 (the "Partial Assignment"); a subsequent assignment of the Partial Assignment from U.S. Realty, Inc. ("US Realty"), to Fuji Real Estate Co., Inc. ("Fuji RE"); and a notice with respect to the same. These three documents are collectively attached as **Exhibit E**. These documents reflect a partial assignment of rents by the Debtor's Leased Lots landlord to Fuji RE, as assignee of US Realty. Neither US Realty nor Fuji RE hold an interest in the Debtor's property.

-    The Owned Lots Title Report, in exception 13, refers to a certain Memorandum of Management Agreement dated September 2, 2010, between the Debtor and Marriott Hotels International B.V., Management Company ("Marriott"). Attached as **Exhibit F** is the Debtor's acknowledgement that such agreement was terminated in 2013 and related documents reflecting the same. Thus, Marriott holds no interest in the Debtor's property.

## III.    The Proposed Sale Transaction.

16.    The proposed Sale Transaction is in the best interests of the Debtor, its estate, and its creditors and the result of arm's length negotiations with a third-party purchaser. The result of these efforts is the Sale Transaction, pursuant to which the Buyer would pay the Debtor's estate approximately $33 million, which is consistent with a recent appraisal.

### A.    Summary of the Sale Transaction to the Buyer.

17.    The APA contains the material items of the Buyer's proposed purchase of the assets and should be consulted as to all of the terms of the proposed sale. Certain material terms of the

6

APA can be summarized as follows:[4]

    i.      **Purchase and Sale**: Excepting any and all Excluded Assets, upon the terms and subject to the conditions set forth therein, on the Closing Date, the Debtor shall sell and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title, and interest in and to the Real Property, the Intellectual Property, the Personal Property, and the Licenses and Permits (the "<u>Assets</u>" or "<u>Property</u>"), in each case free and clear of any Encumbrances, rights, remedies, or interests, except as specifically permitted therein, as approved for sale, transfer, and assignment pursuant to the Sale Order. The Personal Property shall be transferred and conveyed to Purchase pursuant to the terms of the Quitclaim Bill of Sale. For the avoidance of doubt, the Assets shall not include the Excluded Assets.

    ii.      **Excluded Assets**: Notwithstanding anything else to the contrary set forth in the APA, the Assets shall not include, and Buyer shall not buy or have any liability or obligation with respect to, any of the following (collectively, the "<u>Excluded Assets</u>"):

        a.    Cash, cash equivalents, accounts, accounts receivable, credits, rights of reimbursement, set off rights, and rights of recoupment, including, without limitation, any reimbursement rights or other rights arising out of governmental programs; and/or any amounts due for the sale of tax credits;

        b.    Any and all causes of action of the Debtor, whether known or unknown on the Closing Date, including any and all causes of action arising under chapter 5 of the Bankruptcy Code;

        c.    Except as set forth in the APA solely with respect to damage or destruction of any Assets occurring after the entry of the Sale Order, the Debtor's rights and interests under any insurance policies;

        d.    Deposits, including all utility deposits; and

        e.    Any and all Additional Excluded Assets identified in the APA.

    iii.      **Sale Free and Clear**: The Debtor acknowledges and agrees, and the Sale Order shall provide, that on the Closing Date and concurrently with the Closing, the Assets shall be transferred to the Buyer free and clear of all then existing or thereafter arising Claims and Encumbrances to the fullest extent permitted by Section 363(f) of the Bankruptcy Code. The Debtor acknowledges and agrees that this requirement is a precondition to Buyer's obligation to close the Transactions.

    iv.      **Purchase Price**: The purchase price for the Assets (the "<u>Purchase Price</u>") shall consist of: (a) Thirty-Three Million and 00/100 United States Dollars ($33,000,000.00), in cash or by means of a completed federal funds wire transfer to an account or accounts designated by the PACIFIC AMERICAN TITLE

---

[4]    The summary of the terms of the APA set forth herein is intended solely to provide a brief overview of certain material terms. This summary is qualified entirely by reference to the APA, and, in the event of any conflict or inconsistency between the provisions of the Sale Motion and the APA, the APA shall control.

INSURANCE AND ESCROW COMPANY (the "Escrow Company") in writing not later than three (3) Business Days prior to the Closing Date; and (b) the assumption by the Buyer of the liabilities and obligations set forth in Section 2.3 of the APA, if any, provided that the Purchase Price shall be subject to all prorations and adjustments set forth in the APA, including without limitation those set forth in Section 8.7.

**B.**     **The Debtor's Marketing Efforts and Valuation.**

18.     The Sale Transaction is the product of pre- and post-petition marketing and resulted in a proposed price that is consistent with a recent appraisal of the Hotel's value establishing the "as is" market value of the Debtor's fee simple and leasehold interests in the Hotel of approximately $33 million (and excluding the value of any insurance claim that the Debtor holds for damage arising from Typhoon Mawar). Further, the Sale Transaction will provide sufficient funds to pay senior property tax liens (to the extent valid) as well as the Bank's claim (if and when allowed), while also leaving the Debtor's estate with substantial value to provide to junior and unsecured creditors.

19.     To elaborate on the Debtor's marketing efforts, the Debtor engaged in pre-petition marketing of the Hotel and related assets subject to the APA for approximately 12 months, both domestically in Guam and internationally. The Debtor communicated with various brokers and potential purchasers, established a data room for parties who showed significant interest, and executed one or more non-disclosure agreements. The pool of interested purchasers included parties located in Guam as well as those located elsewhere in Asia, including the Philippines, Japan, and South Korea.

20.     On or about August 28, 2023, the Debtor executed an agreement with Deloitte Anjin LLC ("Deloitte"), leisure and hospitality division, from Seoul, South Korea, to find investors for the Hotel. Deloitte canvassed South Korean clients and several began preliminary due diligence. However, this did not result in any firm offers.

21.     On or about February 28, 2024, the Debtor executed a commission agreement with SamilPricewaterhouseCoopers advisory group in Seoul, Korea, to market the Hotel. This did not result in any firm offers.

22.     On March 29, 2024, the Debtor executed a commission agreement with Cushman Wakefield ChaneyBrooks in Hawaii to market the Hotel to a limited pool of Japanese clients, including the Sanno USA Group, which owns hotels in Japan. This did not result in any firm offers.

23.     On or about July 11, 2024, the Debtor executed a commission agreement with Starts Guam Golf Resort Inc. ("Starts Guam") to market the property in Japan and South Korea. Starts Guam is a subsidiary of Starts Corporation, Inc., a Japanese company in the real estate and hotel business with 30 global affiliates. Starts Guam identified potential investors. However, again, this did not result in any firm offers.

24.     Subsequent to the Petition Date, the Debtor engaged in informal marketing efforts in order to maximize value for the Debtor's stakeholders, with the goal of identifying a party who would serve as a stalking horse purchaser to set a floor for a public auction. This marketing process included the Debtor contacting, and being contacted by, potentially interested parties. The details of the Debtor's marketing efforts shall be set forth more fully in the forthcoming *Declaration of Ajay Pothen in Support of Sale Motion* (the "Sale Declaration"), which shall be filed in advance of the Sale Hearing.

25.     The culmination of these informal marketing efforts resulted in formal walk-throughs of the Hotel with four different parties, two actively interested parties, robust negotiations with the prospective purchasers, and ultimately agreement on the terms of the APA. The two interested parties were the Buyer and Goodwind Development Corporation ("GDC") (collectively, the "Interested Parties"). The Interested Parties each engaged in numerous site visits to the Hotel

9

and engaged in extensive communications with the Debtor and its advisors.

26.     The timeline for subsequent negotiations is as follows:

- On or about November 8, 2024, GDC executed an NDA. However, the Debtor notes that GDC first executed an NDA in April 2022 and subsequently engaged in due diligence and extensive discussions with the Debtor regarding a possible transaction from that time until the Petition Date (and afterwards).

- On or about November 23, 2024, the Buyer presented a non-binding letter of intent (the "LOI") to the Debtor, and on December 5, 2024, the Debtor executed the LOI and agreed to its terms.

- On December 18, 2024, the Debtor provided the GDC with a draft asset purchase agreement, following discussions among those two parties.

- On December 20, 2024, the Buyer provided the Debtor a draft asset purchase agreement.

- Throughout January 2025, the Debtor continued to negotiate with the Interested Parties, including exchanging further revised drafts of the APA (on or about January 10, 2025, January 24, 2025, January 29, 2025, and January 30, 2025) and a separate asset purchase agreement with GDC (the "Back-Up APA") on or about January 30, 2025, and negotiations with the Buyer intensified following the Buyer's retention of bankruptcy counsel on or about January 20, 2025, including a productive teleconference between Debtor's counsel and counsel to Buyer on January 28, 2025.

- On January 22, 2025, the Bank informed the Debtor that it intended to proceed with its pending motion for relief from stay [Dkt. No. 55] (the "RFS Motion") unless the Debtor provided a signed asset purchase agreement by February 7, 2025 (the "Bank Deadline"). In subsequent discussions, the Debtor and its counsel informed the Buyer and GDC of the Bank Deadline.

- Negotiations with the Buyer and GDC intensified considerably in the time leading up to the Bank Deadline. Between January 30, 2025, and February 7, 2025, the Debtor and/or its counsel was in daily communication with one or both of the Buyer and GDC, exchanging multiple asset purchase agreement drafts.

- The Debtor and the Buyer reached agreement on a purchase price and final form of asset purchase agreement (as memorialized in the APA) on the morning of February 7, 2025—the Bank Deadline. As noted, the purchase price is $33 million.

- Also on the Bank Deadline (but **after** the Debtor received an executed copy of the APA from the Buyer), GDC informed the Debtor that it would be willing to pay $33.5 million for the Assets. However, the Debtor and GDC had not reached a final form of agreement on many key terms, and it was not possible to do so prior to

expiration of the Bank Deadline.

- Subsequently, the Debtor provided GDC an opportunity to be back up purchaser, as permitted under the APA and, on February 14 (ChST), provided GDC a revision to the last draft asset purchase agreement between these parties.[5] On February 16, 2025, GDC discontinued further negotiations.

27. In the Debtor's business judgment, the Sale Transaction represents the highest or best offer. The Sale Transaction is expected to provide sufficient funds to pay senior property taxes to the Government of Guam and the Bank's claim (if and when allowed), in addition to providing additional funds for junior creditors. Further, as the Debtor weighed the (executed) APA against GDC's oral proposal on the Bank Deadline, the Debtor considered the following:

- The Interested Parties had both engaged in months of due diligence and negotiations, which followed GDC's consideration of the property over a period of years before that time.

- The Debtor had informed the Interested Parties of the Bank Deadline and the Debtor's requirement that it provide the Bank with an executed asset purchase agreement by that date to avoid litigation risk with the Bank that could destroy value for creditors.

- The Debtor had received an executed copy of the APA from the Buyer prior to receipt of GDC's oral communication proposing a higher purchase price.

- At the same time, GDC and the Debtor had not (and still have not) reached agreement on a final form of asset purchase agreement and, accordingly, did not have a binding agreement by the Bank Deadline.

- Under these circumstances, the Debtor determined that breaching the APA with the Buyer created litigation risk that was not warranted. The Buyer could have demanded return of its deposit and refused to serve as a back-up purchaser. The Bank could have proceeded with its RFS Motion. The Debtor could have been left facing litigation without any binding agreement or reached an agreement with GDC but had value from that proposed transaction decreased by litigation costs.

28. In light of these unique facts and circumstances, including the marketing process and robust negotiations with two seriously interested parties, the Debtor submits that the Sale

---

[5] This prior draft had been sent by the Debtor to GDC on February 4, 2025. The parties never reached agreement to terms.

Transaction represents the highest or best offer – as well as being the only offer and, accordingly, one that the Court should approve.

## RELIEF REQUESTED

29.     First, the Debtor seeks entry of an order authorizing the Sale Transaction as a private sale to the Buyer free and clear of all liens, claims, encumbrances and interests under section 363(b), (f), and (m) and upon the terms as set forth in the APA.

30.     Second, the Debtor seeks the authority to assume and assign certain unexpired leases (the "Leases") and/or any executory contracts (the "Selected Contracts") as identified by the Buyer during the due diligence period.

31.     Third, the Debtor seeks the authority to assign any and all permits and licenses (the "Licenses and Permits") needed to operate the Hotel.

32.     All the relief sought by the Sale Motion is set forth with more particularity in the proposed form of the order relating to the Sale Motion filed contemporaneously herewith (the "Sale Order").

## BASIS FOR RELIEF REQUESTED

33.     This Court should grant the Sale Motion and authorize the Debtor to consummate the Sale Transaction because (A) the purchase price is fair and reasonable; (B) the Sale Transaction is the result of appropriate post-petition marketing and arm's length negotiation; (C) the Sale Transaction is in the best interests of the Debtor, its estate, and its creditors because it will result in funds to pay allowed claims; and (D) the Bankruptcy Code authorizes the relief requested, including pursuant to section 365(f) and (m).

**I.      Section 363(b)(1) Provides the Court Authority to Approve the Sale Transaction as a Private Sale.**

34.     Pursuant to section 363(b)(1) of the Bankruptcy Code, after notice and a hearing,

the Debtor may be authorized to use, sell, or lease property of the estate outside of the ordinary course of business. 11 U.S.C. § 363(b)(1); *see In re Qintex Ent., Inc.*, 950 F.2d 1492, 1495 (9th Cir. 1991). Furthermore, the Court has the authority to issue "any order, process, or judgment that is necessary or appropriate" to carry out the provisions of the Bankruptcy Code. 11 U.S.C. § 105(a). With respect to the procedures to be adopted in conducting a sale outside the ordinary course of a debtor's business, Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction." FED R. BANKR. P. 6004(f)(1).

35.     The Court has discretion and responsibility to approve a sale under section 363(b) of the Bankruptcy Code. *See In re Lahijani*, 325 B.R. 282, 288-89 (B.A.P. 9th Cir. 2005). "[A] chapter 11 debtor may sell all or substantially all its assets pursuant to section 363(b) prior to confirmation of a chapter 11 plan, when the court finds a good business reason for doing so." *In re General Motors Corp.*, 407 B.R. 463, 491 (Bankr. S.D.N.Y. 2009); *see also In re AMR Corp.*, 490 B.R. 158, 164 (Bankr. S.D.N.Y. 2013); *Lionel Corp. v. Comm. of Equity Security Holders (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (rejecting the requirement that only an emergency situation permits the use of section 363(b) of the Bankruptcy Code and setting forth the "sound business purpose" test in the context of a sale of substantially all of a debtor's assets under section 363(b)); *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, LLC)*, 650 F.3d 593, 601 (5th Cir. 2011); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986). As long as the sale appear to enhance a debtor's estate, court approval of a debtor's decision to sell should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code. *GBL Holding Co., Inc. v. Blackburn/Travis/Cole Ltd.*, 331 B.R. 251, 255 (N.D. Tex. 2005); *In re Lajijani*, 325 B.R. 282, 285 (B.A.P. 9th Cir. 2005).

36.     Many courts have set forth factors to consider when approving a sale outside the

ordinary course of business, and most courts start with the factors set forth by the Second Circuit in

*In re Lionel*. Those factors are as follows:

> The proportionate value of the asset to the estate as a whole, the amount of elapsed
> time since the filing, the likelihood that a plan of reorganization will be proposed
> and confirmed in the near future, the effect of the proposed disposition on future
> plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis
> any appraisals of the property, which of the alternatives of use, sale or lease the
> proposal envisions and, most importantly perhaps, whether the asset is increasing or
> decreasing in value.

*In re Lionel*, 722 F.2d at 1071.

37.     For a sale outside of the ordinary course to be approved pursuant to section

363(b)(1) of the Bankruptcy Code, courts in the Ninth Circuit follow similar factors as in the

*Lionel* case.  This includes establishing that: "(1) a sound business purpose exists for the sale;

(2) the sale is in the best interest of the estate, i.e., the sale price is fair and reasonable; (3)

creditors received proper notice; and (4) the sale was properly negotiated and proposed on good

faith."  *In re Hernandez*, No. BAP SC-23-1016-BCF, 2023 WL 8453137 (B.A.P. 9th Cir. Dec. 6,

2023); *see Slates v. Reger (In re Slates)*, BAP No. EC-12-1168-KidJu, 2012 WL 5359489, at *11

(B.A.P. 9th Cir. Oct. 31, 2012) (citing *In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 841 (Bankr.

C.D. Cal 1991); *In re Lionel Corp.*, 722 F.2d at 1069.  The Debtor, or trustee if appointed, also

has the burden to prove these elements.  *Id.*

38.     This Court does have the discretion to consider other similar factors as bankruptcy

courts have wide discretion in approving sales under section 363(b) of the Bankruptcy Code.[6]

---

[6]      Other courts have simplified the factors to include, among other things, the consideration to be paid, the
financial condition and needs of the debtor, the qualifications of the buyer, and whether a risk exists that the assets
proposed to be sold would decline in value if left in the debtor's possession.  *Equity Funding Corp. of America v.
Financial Associates (In re Equity Funding Corp.)*, 492 F.2d 793, 794 (9th Cir. 1974); *In re Titusville Country Club*,
128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (setting forth four elements of a "sound business purpose" test: (1) sound
business reason, (2) accurate and reasonable notice, (3) adequate price, and (4) good faith); *see also Wintz v. American*

14

A. **A Sound Business Purpose Exists for the Sale Pursuant to Section 363 of the Bankruptcy Code.**

39. To demonstrate a sound business purpose exists, the Debtor has the burden of proving that "a sound business reason or emergency justifies a pre-confirmation sale." *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995); *In re Delaware & Judson Rwy. Co.*, 124 B.R. 169, 175 (D. Del. 1991); *see also In re Country Manor of Kenton, Inc.*, 172 B.R. 217, 220 (Bankr. N.D. Ohio 1994); *In re Titusville Country Club*, 128 B.R. at 399. Here, a business justification exists to sell the Assets under section 363(b)(1) of the Bankruptcy Code because the terms of the Sale Transaction will provide funds to pay creditors and are fair, reasonable, and the product of arm's-length negotiations with non-insider parties.

40. The Buyer's preference is that the Sale Transaction be a private sale (*i.e.*, a two-party sale rather than a public sale or auction). In this regard, nothing in section 363 of the Bankruptcy Code requires that a sale out of the ordinary course of business be a public sale. Moreover, Bankruptcy Rule 6004(f)(1) allows for a sale outside the ordinary course of business be by a private sale or by a public auction. *See also Suter v. Goedert (In re Suter)*, 396 B.R. 535, 549 (D. Nev. 2008); *In re Frezzo*, 217 B.R. 985, 989 (Bankr. E.D. Pa. 1998) ("[I]t is clear that property may be sold at a public or private sale."). Furthermore, a public auction is not necessary here as the marketing undertaken before execution of the APA satisfies the requirement that the Purchase Price for the Assets is fair and reasonable. *See, e.g., In re Abbott Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also In re Mama's Original Foods, Inc.*, 234 B.R. 500, 504 (Bankr. C.D. Cal. 1999) (holding that the best way to determine the market value of property is to expose the property to the marketplace).

---

*Freightways, Inc. (In re Wintz Cos.)*, 219 F.3d 807, 812 (8th Cir. 2000) ("[T]he bankruptcy courts have wide discretion in structuring sales of assets[.]").

15

41.     Together with its professionals, the Debtor considered various restructuring alternatives and determined, in its business judgment, that a sale of the Assets will maximize the value of the estate for the benefit of all stakeholders most expeditiously and for the least cost. Proceeding with a sale under a chapter 11 plan is a lengthier, riskier, and more expensive process and, as such, is also atypical. Therefore, the Debtor satisfies the requirement for a business justification to sell the Assets via a private sale pursuant to section 363(b)(1) of the Bankruptcy Code.

**B.     The Sale is in the Best Interest of the Bankruptcy Estate and Purchase Price is <u>Fair and Reasonable</u>.**

42.     Courts have also required that the sale price be fair and reasonable, and that the sale be the result of good faith negotiations with the buyer. *See, e.g., In re Abbotts Dairies of Pa.*, 788 F.2d 143, 147-50 (3d Cir. 1986); *see also* 11 U.S.C. § 363(m) ("The reversal or modification on appeal of an authorization under [§ 363(b)] of a sale or lease of property does not affect the validity of a sale or lease . . . to an entity that purchased or leased such property in good faith . . . .").

43.     Here, the proposed Sale Transaction is in the best interest of the Debtor's bankruptcy estate. The APA, which includes a Purchase Price of $33 million, is consistent with the Appraisal as well as the sum of (A) senior secured property taxes (to the extent valid) and (B) the Bank's claim (to the extent valid). The Purchase Price, when combined with other estate assets, also likely ensures sufficient funds to pay administrative expenses and provide distributions to junior creditors. Further, the APA permits the Debtor to obtain a back-up offer in the event the Buyer is unable to close.

**C.     <u>Proper Notice Shall be Provided to the Debtor's Creditors</u>.**

44.     Third, creditors shall receive proper notice for a section 363(b)(1) sale to be

approved. *In re Hernandez*, 2023 WL 8453137, at *4. Further, pursuant to Bankruptcy Rule 2002(a), at least 21 days' notice by mail is required of a proposal to use, sell, or lease property of the bankruptcy estate other than in the ordinary course of business. Additionally, pursuant to Bankruptcy Rule 2002(c), such notice of the Sale Transaction must include the terms and conditions of any private sale and the deadline for filing any objections to the relief requested herein.

45. The Debtor submits that the notice of this Sale Motion and of the Sale Hearing as provided for herein fully complies with Bankruptcy Rule 2002 and constitutes good and adequate notice of the proposed Sale Transaction.

**D.** **The Sale is Necessary and Appropriate and Based Upon Good Faith Negotiations with the Buyer.**

46. Finally, the proposed Sale Transaction was negotiated and proposed on good faith. This provision serves the important purposes of encouraging good faith transactions and preserving the finality of the bankruptcy court's order unless stayed pending appeal. *In re Abbotts Dairies*, 788 F.2d at 147. Courts have generally held that a good faith purchaser is one who buys "in good faith" and "for value." *In re Ewell*, 958 F.2d 276, 281 (9th Cir. 1992). A lack of good faith may be present when, among other things, there exists fraud or collusion. *Id.*

47. The Sale Transaction and APA are the product of an arm's length, good faith negotiations and does not perpetrate any fraud or collusion. The Debtor submits that the proposed sale to the Buyers is entirely consistent with the guidelines set forth in applicable case law. If the Court approves the Sale Transaction, it should also invoke section 363(m) of the Bankruptcy Code to protect the Buyer's acquisition by explicitly finding that the parties acted in good faith. As noted above, the Debtor, with the assistance of its professionals, extensively marketed the Hotel to numerous potential purchasers to enable such parties to conduct due diligence with respect to the Debtor if interested. The Debtor is unable to secure an offer at this time for the

17

Assets that provided more consideration to the Debtor's bankruptcy estate than the APA. Thus, a prompt sale is in the best interests of its creditors and estate, and will maximize the amount that the Debtor, its creditors, and its bankruptcy estate may realize from the sale of the Assets.

## II. It is Appropriate to Approve the Sale Transaction Free and Clear of Liens, Claims, Encumbrances and Interests Under Section 363(f).

48. The Debtor requests authorization to sell the Assets free and clear of liens, claims, encumbrances, and other interests subject to the provisions contained herein. Section 363(f) of the Bankruptcy Code provides that:

> The trustee may sell property under [section 363(b)] free and clear of any interest in such property of an entity other than the estate, only if—
>
> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11. U.S.C. § 363(f). "Because the language of § 363(f) is in the disjunctive, courts can approve a sale if any one of the five conditions is satisfied." *BAC Home Loans Servicing LP v. Grassi*, 2011 WL 6096509, at *5 (B.A.P. 1st Cir. Nov. 21, 2011).

49. If any one of the five requirements of section 363(f) is met, then a sale free and clear of liens should be authorized. *Citicorp Homeowner Services, Inc. v. Elliott (In re Elliott)*, 94 B.R. 343, 345 (E.D. Pa. 1988). The Sale Transaction satisfies one or more of the foregoing requirements.

50. First, as to section 363(f)(1), senior lienholders have the right to foreclose real or

personal property interests free and clear of junior interests. While disputed as to the amounts, the property taxes owed to the Treasurer of Guam are likely senior to the Bank's liens, and Guam has authority to auction property for delinquent taxes. *See* 11 G.C.A. § 24203 ("All tax liens are paramount to other liens") & 24810 (authorizing the Guam tax collector to auction property for unpaid real property taxes and distribute excess proceeds to the owner of record). Similarly, Guam recognizes the ability of a senior lienholder to foreclose real property free and clear of a junior lienholder's claim and permits. *See generally* 7 G.C.A. §§ 24101-24108 (foreclosure); 18 G.C.A. § 36112 (authorizing mortgagee to foreclose the mortgagor's redemption right). Thus, Bank of Guam could foreclosure any junior interests (which may, or may not, include property taxes). Relatedly, Guam has enacted Article 9 of the Uniform Commercial Code, including the right of a secured party to disputes of collateral. *See* 13 G.C.A. § 9504. Thus, to the extent SBA holds any interest in the Debtor's personal property, it could sell such property free and clear of any junior interests.

51. Second, as to section 362(f)(2), the Debtor anticipates that the Bank will likely consent to the Sale Transaction, and it is difficult to see how the Bank could object, given the terms of the Sale Transaction would likely be sufficient to pay the Bank's allowed claim in full. Relatedly, certain holders of claims or interests may be deemed to have consented to the sale of the Assets if they do not object. However, if any parties holding claims or interests in the Assets to be sold are not willing to consent to the Sale Transaction, this Court is nonetheless empowered to authorize the sale free and clear of any such interest as long as creditors receive the value of any collateral in which they hold an interest. *See In re Boston Generating, LLC*, 440 B.R. 302, 332 (Bankr. S.D.N.Y. 2010); *In re Beker Indus. Corp.*, 63 B.R. 474, 477 (Bankr. S.D.N.Y. 1986); *In re Oneida Lake Dev., Inc.*, 114 B.R. 352, 356-57 (Bankr. N.D.N.Y. 1990).

19

52.     Further, section 363(f)(4) is satisfied as well.  First, all tax claims are in bona fide dispute (and this is indicated in the Debtor's bankruptcy schedules).  *See* Schedule D [Dkt. No. 75, line 2.3] and Schedule E/F [Dkt. No. 76, lines 3.21-3.25].  Second, the Bank of Guam's claim is scheduled as disputed.  *See* Schedule D [Dkt. No. 75, line 2.1].

53.     Lastly, the requirement of section 363(f)(5) is also satisfied because secured creditors can be compelled to accept a money satisfaction of their respective interests.  *See, e.g., In re James*, 203 B.R. 449, 453 (Bankr. W.D. Mo. 1997); *In re Grand Slam U.S.A., Inc.*, 178 B.R. 460, 461-62 (E.D. Mich. 1995).  Courts considering this issue have held that the "cramdown" provision under the Bankruptcy Code constitutes a "legal or equitable proceeding" and permits a sale under section 363(f)(5) of the Bankruptcy Code.  *See, e.g., Grand Slam*, 178 B.R. at 464; *In re Levitt & Sons, LLC*, 384 B.R. 630, 648 (Bankr. S.D. Fla. 2008); *In re Gulf States Steel, Inc. of Ala.*, 285 B.R. 497, 508 (Bankr. N.D. Ala. 2002); *Scherer v. Fed. Nat. Mortg. Ass'n (In re Terrace Chalet Apartments, Ltd.)*, 159 B.R. 821, 829 (N.D. Ill. 1993).  Thus, section 363(f)(5) is satisfied with respect to all liens junior Guam's property tax lien (if senior to the Bank) or the Bank, and the Sale Transaction is likely to provide sufficient sale proceeds to pay any allowed claim for senior property taxes and the Bank.

54.     Accordingly, the transaction will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code and the sale of any assets through the Sale Transaction should be approved free and clear of liens, claims, and encumbrances.  Each of the parties holding claims or interests in the Assets to be sold could be compelled to accept monetary satisfaction of such claims. In addition, absent any objection to this Sale Motion, certain holders of claims or interests may be deemed to have consented to the sale of the Assets.  Finally, any liens, claims, or interests that may exist will attach to the net cash proceeds of such transaction, subject to any claims and defenses,

24507831.v9

if any, that the Debtor or any party of interest may possess with respect thereto.

### III. The Buyer Should be Afforded All Protections Under Section 363(m) as a Good Faith <u>Buyer.</u>

55.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor's estate notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.   Specifically, section 363(m) of the Bankruptcy Code states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale… to an entity that purchased…such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale were stayed pending appeal.

11 U.S.C. § 363(m).   Section 363(m) of the Bankruptcy Code "codifies Congress's strong preference for finality and efficiency" in bankruptcy proceedings.  *In re Energytec, Inc.*, 739 F.3d 215, 218-19 (5th Cir. 2013).  The Ninth Circuit has repeatedly held that, under section 363(m) of the Bankruptcy Code, "[w]hen a sale of assets is made to a good faith purchaser, it may not be modified or set aside unless the sale was stayed pending appeal."  *Paulman v. Gateway Venture Partners III, L.P. (In re Filtercorp, Inc.)*, 163 F.3d 570, 576 (9th Cir. 1998); *In re Ewell*, 958 F.2d 276, 282 (9th Cir. 1992) ("Because the Buyer was a good faith purchaser, under 11 U.S.C. § 363(m) the sale may not be modified or set aside on appeal unless the sale was stayed pending appeal."); *Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.)*, 846 F.2d 1170, 1172 (9th Cir. 1988) ("Finality in bankruptcy has become the dominant rationale for our decisions").

56.     Here, the selection of the Buyer and Sale Transaction is the product of arms' length, good faith negotiations.  The Debtor requests that the Court make a finding at the Sale Hearing that the Buyer is a good faith purchaser entitled to protections of section 363(m) of the Bankruptcy Code.

## IV.    The Assumption and Assignment of Executory Contracts and Unexpired Leases is Appropriate.

57.    Section 365(a) of the Bankruptcy Code provides that, subject to the Court's approval, a trustee "may assume or reject any executory contracts or unexpired leases of the debtor." 11 U.S.C. § 365(a).  Upon exercising sound business judgment, a debtor is authorized to assume an executory contract and unexpired leases provided that, at the time of assumption, the debtor: (a) cures, or provides adequate assurance that the debtor will promptly cure, any default; (b) compensates, or provides adequate assurance that the debtor will promptly compensate, the counterparty for any actual pecuniary loss resulting from any default; and (c) provides adequate assurance of future performance under the executory contract or unexpired lease.  *See* 11 U.S.C. § 365(a), (b)(1).  A default based upon the filing of the bankruptcy case or the insolvency or financial condition of the debtor need not be cured. *See* 11 U.S.C. § 365(b)(2).

58.    In the case of an assumption and assignment, the purchaser or assignee provides the adequate assurance of future performance.  *See* 11 U.S.C. § 365(f)(2).  The Bankruptcy Code does not define the term "adequate assurance," and courts have found that "the term 'adequate assurance' was intended to be given a practical, pragmatic construction."  *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009).  Adequate assurance is "something less than an absolute guarantee."  *Id.*  Among other things, adequate assurance may be given by demonstrating the buyer's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygraph, Inc.*, 56 B.R. 597, 605-06 (Bankr. S.D.N.Y. 1986).

59.    In this case, under the terms of the APA, the Buyer does intend to have executory contracts and/or unexpired leases assumed by the Debtor and assigned to Buyer as detailed in the APA.  The Debtor, pursuant to this Sale Motion, seeks the authority to assume and assign the Leases and/or Selected Contracts designated by the Buyer as a result of its due diligence to be

22

assumed and assigned to the Buyer. To accomplish this goal in the most fair and expeditious manner, the Debtor shall provide the counterparties to any and all executory contacts and unexpired leases with notice to the proposed assumption and assignment of the Leases and/or Selected Contracts, specifically stating that the Debtor is or may be seeking assumption and assignment of such Selected Contracts, the Debtor's calculated cure amounts, and the deadline for objecting to the proposed cure amounts or any other aspect of the proposed assumption and assignment of their Selected Contracts and/or Leases to the Buyer (the "Initial and Assignment Notice").

60.     At the Sale Hearing, to the extent necessary, the Debtor shall be prepared to proffer testimony or present evidence to demonstrate the ability of the Buyer to perform under the Leases and Selected Contracts. The Sale Hearing, therefore, shall provide this Court and other interested parties with the opportunity to evaluate the ability of the Buyer to provide adequate assurance of future performance under any Leases and/or Selected Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code. Accordingly, it is requested that, at the conclusion of the Sale Hearing, the proposed assumption and assignment of any Leases and/or Selected Contracts be approved.

61.     Further, the Debtor requests that it be relieved from any further liability with respect to the Leases and/or Selected Contracts after assumption and assignment to the Buyer. *See* 11 U.S.C. § 365(k).

## NOTICE

62.     The Sale Motion and/or the sale notice (the sale notice as required by the Local Rules, the "Sale Notice") shall be served in accordance with Local Rule 6004-1.

## CONCLUSION

Based upon the foregoing, the Debtor requests that this Court: (i) enter the proposed Sale Order authorizing the sale to the Buyer and granting the relief requested therein; and (ii) grant such other or further relief as the Court deems just and proper.

Dated: February 17, 2025                    Respectfully submitted,

**LAW OFFICES OF MINAKSHI V. HEMLANI, P.C.**

*/s/ Minakshi V. Hemlani*
**MINAKSHI V. HEMLANI**

**DENTONS BINGHAM GREENEBAUM LLP**

*/s/ Andrew C. Helman*
**ANDREW C. HELMAN**

*Counsel for the Debtor*

24

24507831.v9

## CERTIFICATE OF SERVICE

      This is to certify that I have on February 17, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States District Court for the Territory of Guam, Bankruptcy Division, thereby serving all parties in interest receiving service in this case through the Court's electronic filing system.

                      **DENTONS BINGHAM GREENEBAUM LLP**

                      */s/ Andrew C. Helman*
                      **ANDREW C. HELMAN**

24507831.v9